J-S17033-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: O.C.-A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 55 EDA 2022 |

Appeal from the Order Entered December 7, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001156-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: O.E.C.-A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 56 EDA 2022 |

Appeal from the Decree Entered December 7, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000473-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: Y.A.-C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 57 EDA 2022 |

Appeal from the Order Entered December 13, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002226-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: Y.E.C.-A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 58 EDA 2022 |

Appeal from the Decree Entered December 7, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000474-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: I.C.-A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 59 EDA 2022 |

Appeal from the Order Entered December 13, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001157-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: I.E.C.A., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 60 EDA 2022 |

Appeal from the Decree Entered December 7, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000475-2020

J-S17033-22

BEFORE:  BOWES, J., LAZARUS, J., and STABILE, J.

MEMORANDUM BY BOWES, J.:                    **FILED JULY 18, 2022**

In these consolidated appeals, E.A. ("Father") appeals respective orders changing the permanent placement goals of his three children, O.C.-A., a/k/a O.E.C.-A., Y.A.-C., a/k/a Y.E.C.-A., and I.C.-A., a/k/a I.E.C.A., from reunification to adoption. In addition, Father appeals the December 7, 2021 decrees involuntarily terminating his parental rights to O.C.-A., Y.E.C.-A., and I.C.-A.[1] Upon careful review, we affirm.[2]

The relevant facts and procedural history are as follows. O.C.-A. was born to Mother and Father in June of 2012. His brothers Y.E.C.-A. and I.C.-A. were born in September of 2018 and April of 2014, respectively. The Philadelphia Department of Human Services ("DHS") first became aware of this family in February of 2018, prior to Y.E.C.-A.'s birth, upon receiving a report alleging medical neglect of the children. N.T., 5/11/18, at 15. In its investigation, DHS learned that I.C.-A. suffers from a heart condition, and that his cardiology appointments had been neglected. *Id*. at 9; N.T., 8/23/18, at 9. In addition, I.C.-A.'s primary care appointments were neglected, and, for

_____

[1] M.C.-L. ("Mother") filed appeals from the December 13, 2021 goal change orders and the December 7, 2021 decrees involuntarily terminating her parental rights to Y.E.C.-A. and I.C.-A., which this Court consolidated *sua sponte*. We dispose of her appeal by separate memorandum.

[2] The Honorable Allan L. Tereshko presided over the subject proceeding, and he presided over the underlying dependency proceedings.

- 3 -

reasons unspecified in the record, I.C.-A. needed orthopedic and ophthalmology appointments. N.T., 5/11/18, at 9.

DHS also learned that Father and Mother were married and living with O.C.-A. and I.C.-A. in the home of Father's parents, along with them and Father's two adult siblings. N.T., 12/7/21, at 23. Shortly after DHS received the report, Mother left the home with O.C.-A. and I.C.-A. N.T., 5/11/18, at 15. She returned with the children in approximately April of 2018, at which time DHS received a second report alleging that the children's healthcare was being neglected; domestic violence was occurring between Father and Mother; and inappropriate discipline was inflicted by the paternal grandparents. *Id.* at 6, 8, 15; N.T., 12/7/21, at 9.

On May 3, 2018, DHS assisted Mother, O.C.-A., and I.C.-A. in leaving the home and moving to a domestic violence shelter. N.T., 8/23/18, at 15. The record reveals that, at the time of their removal from the home, O.C.-A. had dried blood on his shirt, which he stated to the DHS caseworker was the result of Father punching him in the face. *Id*. at 13.

On May 9, 2018, the trial court placed O.C.-A., then nearly six years old, and I.C.-A., then four years old, in the protective custody of DHS, due to Mother notifying DHS that she planned to return to Father's home, and that she was able to protect the children from Father. *Id.* at 7, 10. At the time of their placement, O.C.-A. and I.C.-A. were still wearing diapers and drinking from bottles. *Id*. at 9. In addition, they were minimally verbal. *Id*.

The trial court placed O.C.-A. and I.C.-A. in shelter care on May 11, 2018. The court held a dependency hearing on August 23, 2018, during which counsel for Father and Mother stipulated to the adjudication of dependency based on "present inability" to provide proper parental care. N.T., 8/23/18, at 4-5; *see also* 42 Pa.C.S. § 6302 (defining, in part, "dependent child," as one who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk . . ."). By order dated August 23, 2018, the court adjudicated O.C.-A. and I.C.-A. dependent and established their permanency goal as reunification.

Mother gave birth to Y.E.C.-A. in September of 2018. Upon discharge from the hospital, the court placed Y.E.C.-A. in the protective custody of DHS. Following hearings, the court placed Y.E.C.-A. in shelter care on October 1, 2018, and adjudicated him dependent on October 11, 2018. Y.E.C.-A.'s permanency goal was also reunification.

At the time of O.C.-A.'s and I.C.-A.'s adjudication, the trial court directed that DHS refer Father for a psychological evaluation, a parenting capacity evaluation, and domestic violence counseling. Father had already been participating in "line of sight, line of hearing" visits with O.C.-A. and I.C.-

A., supervised by a community umbrella agency ("CUA"). The trial court maintained the supervised visits, along with the requirement that he speak only the English language during them. N.T., 8/23/18, at 26-27. It is undisputed that English is Father's second language.

Father participated in a psychological evaluation with Dana P. Reinhold, Ph.D., in September of 2018, which was assisted by an Arabic language interpreter. Dr. Reinhold diagnosed Father with adjustment disorder with depressed mood and suspected adult physical abuse. Father self-reported that he suffers from multiple sclerosis resulting in his need for a wheelchair and in-home nursing care. Dr. Reinhold recommended that Father participate in domestic violence counseling for men who have engaged "in mutual domestic violence"; a parenting program; and individual counseling. Psychological Evaluation, 9/27/18, at 15.

In July of 2019, Father participated in a parenting capacity evaluation with Sheetal A. Duggal, Psy.D., which was also assisted by an Arabic language interpreter. In contrast to his psychological evaluation in 2018, Father reported to Dr. Duggal that he suffers from muscular dystrophy. Parenting Capacity Evaluation, 7/30/19, at 9. Dr. Duggal concluded that Father did not then have the capacity to provide safety or permanency for O.C.-A., I.C.-A., and Y.E.C.-A. Dr. Duggal's conclusion was based, in part, on (1) Father's projecting responsibility to Mother for I.C.-A.'s and O.C.-A.'s medical neglect

and inappropriate discipline and (2) his repeated unsubstantiated allegations that Mother sexually abused O.C.-A. and I.C.-A.

Dr. Duggal recommended that another parenting capacity evaluation be conducted following Father's completion of the recommendations listed in the evaluation, *i.e.*, Father continues with his mental health therapy; participates in a parenting program for children with complex medical/mental health needs; complies with his permanency plan objectives; and provides documentation from his medical provider regarding his medical condition and prognosis and what effect, if any, it has on providing for the children's essential needs.

Permanency review hearings were held at regular intervals. Despite Father being in moderate compliance with his permanency plan objectives by September of 2021, he did not make progress in his parental capacity; therefore, Father never advanced to unsupervised visits with O.C.-A., I.C.-A., and Y.E.C.-A. N.T., 12/7/21, at 18-20. For instance, according to Britney Hall, the CUA caseworker for the family from June of 2018, until September of 2021, Father reverted to prohibited behavior during supervised visits, such as handing large sums of money to O.C.-A. and I.C.-A., escorting them to the bathroom, and speaking Arabic. *Id.* at 41-42. In addition, Ms. Hall testified that Father "frequently tells the children that they'll be coming home with him within the next week or two from that visit," which causes O.C.-A. and I.C.-A. to behave negatively. *Id*. at 47-48.

In January of 2019, the CUA referred Father and Mother to a family school program for the purposes of providing more visitation with O.C.-A., I.C.-A., and Y.E.C.-A. and determining whether Father and Mother were able to have unsupervised visits with the children. N.T., 12/7/21, at 88. The family school program unsuccessfully discharged Father and Mother in May of 2019, due to Father and Mother portraying domestic violence with and toward each other. *Id*. at 66, 88-89.

Although Father had completed a domestic violence program for victims of domestic violence in 2018, the CUA referred him to a domestic violence program in 2020, for perpetrators of domestic violence. N.T., 12/7/21, at 15-17. Father was unsuccessfully discharged from the program because he would not acknowledge being a perpetrator of domestic violence. *Id*. at 16.

On December 22, 2020, DHS filed petitions to change the permanency goals of O.C.-A., I.C.-A., and Y.E.C.-A. to adoption. On the same date, DHS filed petitions to involuntarily terminate Father's and Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). The combined evidentiary hearing occurred on December 7, 2021, when O.C.-A. was nine years old; I.C.-A. was seven years old; and Y.E.C.-A. was three years old. The legal interests of O.C.-A. and I.C.-A. were represented by Mario D'Adamo,

Esquire. [3]   The best interests of all of the children were represented during the hearing by the Support Center for Child Advocates.[4,]

DHS presented the testimony of the CUA caseworkers, Britney Hall, *via* telephone, and her successor, Khalif Rhodan; E.B., the foster mother of O.C.-A. and I.C.-A.; K.G., the foster mother of Y.E.C.-A.; and Beatrice Coles, the CUA caseworker who supervised Mother's and Father's visits with O.C.-A., I.C.-A., and Y.E.C.-A. since December of 2021.   Father and Mother both testified on their own behalf.

The testimony of Ms. Hall and the foster mothers revealed that the three children have special needs.   Specifically, O.C.-A. is diagnosed with Attention

---

[3] Attorney D'Adamo stated on the record in open court that O.C.-A. understood the concept of adoption and told him "he enjoys being where he is, but that, ultimately, he wants to return with his father."  N.T., 12/7/21, at 144.  While I.C.-A. does not understand the concept of adoption, he and told Attorney D'Adamo "he just wants to do whatever his older brother wants." **Id**. at 143.

Inasmuch as Y.E.C.-A's legal interests were incapable of ascertainment due to his young age, the court did not appoint separate legal counsel for Y.E.C.-A. **See In re T.S.**, 192 A.3d 1080, 1092-1093 (Pa. 2018) (holding, "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act" is satisfied.).

[4] The certified record does not identify a specific individual as Child Advocate; however, Frank P. Cercone, Esquire, who is associated with the aforementioned Support Center for Child Advocates, is listed in our records as the initial guardian *ad litem*.  Two additional attorneys subsequently entered their appearances in this Court as guardian *ad litem* and filed a brief in support of the decrees involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a) and (b).

Deficit Hyperactivity Disorder ("ADHD"), and he receives trauma-based therapy due to behavioral issues. *Id.* at 26. As discussed above, I.C.-A. suffers from a cardiac problem, which is monitored by St. Christopher's Hospital. *Id.* at 26, 109. In addition, I.C.-A. receives trauma-based therapy for behavioral issues. *Id.* at 26.

O.C.-A. and I.C.-A. have resided in the same pre-adoptive foster home since October of 2019, when they were seven and five years old, respectively. *Id.* at 105-106. According to their foster mother, O.C.-A. and I.C.-A. were unable to spell two and three letter words when they began residing with her. *Id.* at 106. At present, the foster mother testified that both children are "really delayed in" reading, math, and comprehension. *Id*. at 108. O.C.-A. and I.C.-A. were evaluated by a school psychologist in 2020, and they were tested for Individualized Education Plans ("IEP") in October of 2021. *Id*. The IEPs had not been finalized at the time of the subject proceeding. *Id*.

With respect to the youngest child, Y.E.C.-A. receives speech therapy for delayed speech. N.T., 12/7/21, at 26-27, 137, 139. In addition, Y.E.C.-A. has an IEP. *Id*. at 137. Since he was three days old, Y.E.C.-A. has resided in his current pre-adoptive foster home, separate from his brothers. *Id*. at 137, 140.

On December 7, 2021, the trial court changed the permanency goals of O.C.-A., I.C.-A., and Y.E.C.-A. to adoption and involuntarily terminated Father's and Mother's parental rights pursuant to the grounds asserted in the

termination petitions.[5]  Father timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*.  The trial court issued its Rule 1925(a) opinion on February 16, 2022.

On appeal, Father presents the following issues for review:

1.     Did the trial court commit reversible error and abuse its discretion by issuing factual findings unsupported by the evidence and by depriving [Father] of due process by restricting presentation of evidence and limiting [Father]'s opportunity to cross-examine witnesses?

2.     Did the trial court commit reversible error and abuse its discretion by relying upon impermissible hearsay and by limiting counsel for [F]ather in cross-examining witnesses?

3.     Did the trial court abuse its discretion by discriminating against [F]ather due to his inability to speak sufficient English and his purported physical limitations?

4.     Did the trial court abuse its discretion by denying without explanation multiple requests by [Father] to expand his visitation time with the subject children, over the course of several years?

5.     Did the trial court abuse its discretion by denying without explanation multiple requests by [Father] for an updated Parenting Capacity Evaluation, despite the fact that the evaluation upon which the court relied was over two years old and recommended that "a re-evaluation be conducted following completion of the above recommendations"?

6.     Did the trial court abuse its discretion by limiting testimony from [Father] and his family members, intended to negate the court's long-held, erroneous, preconceived notion that

---

[5] With respect to the goal change orders for I.C.-A. and Y.E.C.-A., the trial court entered amended orders on December 13, 2021, that corrected a clerical mistake that omitted the goal change to adoption.

> [Father] is physically unable to care for himself or his children?
>
> 7. Did the trial court abuse its discretion and commit reversible error by failing to consider the well-reasoned preferences of the children to spend more time with [Father] and to be reunited with [Father]?

Father's brief at 4-5. We note with disapproval that Attorney D'Adamo neglected to file a brief advocating the children's legal interests in this appeal.

At the outset, we observe that since Father omits any discussion of the goal change orders in his brief, he has abandoned any challenge to those orders. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-466 (Pa.Super. 2017) (citation omitted) (reiterating that a claim is waived where an appellate brief fails to provide any discussion of the claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review). Hence, to the extent that Father alleges error with respect to the prior dependency proceedings, he is not entitled to relief because the propriety of those proceedings are not currently before this Court.

Likewise, the first three issues listed in Father's statement of questions presented are waived because he failed to provide meaningful discussion with citation to any statutory authority or caselaw regarding (1) the guarantee of due process of law under the Fourteenth Amendment to the United States Constitution; (2) the admission of hearsay and limitation of cross-examination during the December 7, 2021 termination of parental rights hearing; or (3) the trial court's alleged discrimination against him due to a physical disability

and inability to speak English.[6]  *In re M.Z.T.M.W.*, *supra* at 465-466;

Pa.R.A.P. 2119(a) and (b).[7]

_____

[6] Even if the third issue was not waived, Father's claim would fail for the identical reasons we discuss in our review of issue six relating to the trial court's alleged bias against Father.  As set forth in that discussion, the evidence supports the involuntary termination decrees notwithstanding Father's physical limitations and English-language limitations.

[7] As both DHS and the Child Advocate highlight, Father's brief is defective insofar as he has failed to comply with several aspects of Pa.R.A.P. 2111 and the related procedural rules governing the content of briefs.  First, we observe that Father's brief violates Pa.R.A.P. 2135(a)(1), which limits a principal brief to 14,000 words and requires the appellant to file a certificate of compliance with the word count limit if the brief is longer than thirty pages.  The substantive portion of Father's brief spans more than eighty pages.  Although Father filed a certificate of compliance with the word count limit, our review of the brief confirms that Father's brief is nearly 15,000 words.

In addition, Father failed to comply with Pa.R.A.P. 2118, which provides that "[t]he summary of argument shall be a concise, but accurate, summary of the arguments presented in support of the issues in the statement of questions involved."  Father's six-sentence summary of argument fails to summarize the arguments in support of the seven enumerated issues listed in the statement of questions involved in his brief.

Finally, with respect to the argument section of briefs, Pa.R.A.P. 2119(a) provides:

> The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part — in distinctive type or in type distinctively displayed — the particular point treated therein, followed by such discussion and citation of the authorities as are deemed pertinent.

Pa.R.A.P. 2119(a).

Father's thirty-five page argument is divided into three parts, none of which corresponds to any of the seven questions presented for review. Furthermore, Father's entire argument cites legal authority for only three

*(Footnote Continued Next Page)*

We consider Father's remaining issues in the context of determining whether the decrees are supported by competent evidence. ***In re Adoption of C.M.***, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, appellate courts must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. ***Interest of S.K.L.R.***, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." ***In re Adoption of L.A.K.***, 265 A.3d 580, 591 (Pa. 2021).

Simply put, "An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion," or "the facts could support an opposite result." ***In re Adoption of S.P.***, 47 A.3d 817, 826–827 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id***. at 826. This standard of review reflects the deference

_____

unremarkable propositions that he neglects to incorporate with meaningful discussion. ***See*** Father's brief at 79, 81.

Although Rule 2101 permits this Court to dismiss the entire appeal for appellate briefs that are substantially defective, the deficiencies in Father's brief do not warrant wholesale dismissal because they do not utterly foreclose our review. Rather than dismiss the appeal, we review Father's assertions and where specific defects impede our review of given issues, we will find those issues waived for the reasons explained in the body of this writing.

we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123–1124.

The involuntary termination of parental rights is governed by § 2511 of the Adoption Act, which requires a bifurcated analysis. 23 Pa.C.S. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under § 2511(a). Only if the court determines that the petitioner established grounds for termination under § 2511(a) does it then engage in assessing the petition under § 2511(b), which involves a child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must prove grounds under both § 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, *supra* at 359 (*quoting Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)).

It is axiomatic that we need only agree with any one subsection of § 2511(a), along with § 2511(b), to affirm the termination of parental rights. *In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa.Super. 2019) (*en banc*) (citation omitted). In this case, we analyze the decrees pursuant to § 2511(a)(2) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

The grounds for termination of parental rights under § 2511(a)(2) due to parental incapacity are not limited to affirmative misconduct; those grounds may also include acts of refusal and incapacity to perform parental duties. *In re S.C.*, 247 A.3d 1097, 1104 (Pa.Super. 2021) (citation omitted). We have long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa.Super. 2017) (citation omitted). At a termination hearing, the orphans' court may properly reject as untimely or disingenuous a parent's vow to follow through on necessary services when the parent failed to co-operate with the agency or take advantage of available

- 16 -

services during the dependency proceedings. *In re S.C.*, *supra* at 1105 (citation omitted).

With respect to § 2511(b), this Court has stated that the trial court "must . . . discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005) (citation omitted). Further,

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010).

In this case, as described above, Father consented to the August 23, 2018 dependency adjudication of O.C.-A. and I.C.-A. based on "present inability" to provide proper parental care and control. Y.E.C.-A. was adjudicated dependent less than two months later, shortly after his birth. Indeed, the record reveals that O.C.-A. and I.C.-A., who were nearly six years old and four years old at the time of their placement in May of 2018, were wearing diapers, drinking from bottles, and minimally verbal. In addition, DHS confirmed allegations of the medical neglect of O.C.-A. and I.C.-A., domestic violence in the home between Father and Mother, and inappropriate

discipline inflicted on O.C.-A. and I.C.-A. by the paternal grandparents.[8] N.T., 12/7/21, at 38.

By July of 2019, Father participated in a parenting capacity evaluation with Dr. Duggal, who opined that Father still did not have the capacity to provide proper parental care and control to O.C.-A., I.C.-A., and Y.E.C.-A. Dr. Duggal reasoned that Father failed to take responsibility for any of the reasons that the children were in placement, and he continued to make unsubstantiated allegations that Mother sexually abused O.C.-A. and I.C.-A. Parenting Capacity Evaluation, 7/30/19, at 13-14. In addition, Dr. Duggal stated that he had

> overt concerns regarding possible cognitive limitations for [Father] that appeared unrelated to his marked language barriers. Although an interpreter was present to mitigate the communication barrier and questions were simplified, [Father] required a greater degree of simplification of statements posed prompting concerns regarding his cognitive functioning. . . . Notably, as the evaluation progressed [,] [Father] appeared to exhibit more difficulties with comprehension, confusion, and required questions to be simplified[,] and despite this[,] he was off topic and was expansive with providing unrelated information, albeit an interpreter was present to translate. These deficits are likely to impact his use of concrete thinking and task execution and decision-making absent any supports.

*Id*. at 11.

During the subject proceeding, Ms. Hall, the CUA caseworker from June of 2018, until September 2021, testified that Father has cognitive limitations

---

[8] The record does not describe the nature of the discipline deemed to be inappropriate.

- 18 -

and does not have the mental capacity to navigate medical appointments and otherwise meet the special medical, physical, and educational needs of the children. N.T., 12/7/21, at 29, 39-40. Ms. Hall testified that Father self-reported that he cannot read or write, although she did not specify if that was with respect to both English and Arabic, and that he has only an elementary school education. *Id*. at 41, 59-16, 62-63. On inquiry by the trial court, Ms. Hall testified:

> [Q]: Ms. Hall, will you remind [Father's] counsel where that information comes from and what is the basis of your belief that he cannot read and write?
>
> [A]: The basis for him being [un]able to read and write came from [F]ather himself. The ability to understand the documents or to understand the conversation that is being held comes from [Father] himself, and he is able to let you know what he can and cannot do.
>
> This is not just based off of my opinion; th[is] is from working with [Father] since 2018.

*Id*. at 62-63.

Ms. Hall remained the CUA caseworker for this family until September of 2021, which was three months before the subject proceeding. Ms. Hall testified that Father was participating in supervised visits for one-and-one-half hours per week at the time she left the case. N.T., 12/7/21, at 20. She explained that Father's visits never became unsupervised because he did not achieve his permanency plan goals, despite moderate compliance. *Id*. For instance, Father did not progress in demonstrating parenting skills during the supervised visits. Ms. Hall testified on cross-examination by the Child

Advocate that Father has never helped the children with homework during supervised visits. *Id.* at 47. She stated that Father "frequently tells the children that they'll be coming home with him within the next week or two from that visit," and that O.C.-A. and I.C.-A. "display behavioral issues negatively when [F]ather tells them that they'll be returning home, and then they're informed that that is not correct information." *Id*. at 47-48.

Ms. Coles, another CUA caseworker, began supervising Father's visits with O.C.-A., I.C.-A., and Y.E.C.-A. in May of 2021. *Id*. at 120. Ms. Coles testified that, during the November 23, 2021 supervised visit, Father wanted to give the children $100, which she did not allow. *Id*. at 124. Similarly, O.C.-A.'s and I.C.-A.'s foster mother, E.B., testified that, on an unspecified occasion, "the boys had $90 in their socks . . . and that — for a seven-year-old and a nine-year-old to have 90, and one to have 70, that's a little excessive." *Id*. at 115. On cross-examination by Father's counsel, Ms. Coles testified, "I would not object to him giving them money, but the amount of money" was her concern. *Id*. at 131-132. Moreover, Ms. Hall explained on cross-examination by the Child Advocate that Father attempted to give "the children large amounts of money after being redirected several times because it causes issues with the children, either in the home, in school, or with their behavior." *Id*. at 42.

It is important to note that Father testified on direct examination that he did not give the children $100, but "one or two" dollars. *Id*. at 164.

However, the trial court stated on the record in open court at the conclusion of the hearing, "I find [F]ather not to be a credible witness. During the course of his testimony, I find that some of the testimony was scripted, and it was not a spontaneous response to the issues. . . ." *Id*. at 189.

Further, Ms. Coles testified that Father does not correct O.C.-A.'s, I.C.-A.'s, and Y.E.C.-A.'s behavior during the supervised visits. *Id*. at 126. She explained, "the children have a tendency to run and jump and do things along those lines, which can be dangerous to them in that small room that visits [occur] in. . . . I redirect them." *Id*. at 127.

Ms. Hall testified that Father was in moderate compliance with the plan, but he never completed a domestic violence program for perpetrators, rather than victims, because he did not acknowledge being a perpetrator. *Id*. at 15-19. In addition, Ms. Hall testified that Father is "wheelchair-bound." *Id*. at 24. She testified, "I don't know the full diagnosis that he has. I just know that it results in muscular atrophy." *Id*. Ms. Hall testified that Father never provided medical documentation. *Id*. at 39. As such, the CUA did not know the extent of Father's limitations or prognosis over time.

Further, Ms. Hall testified Father self-reported "that he does get disability" payments. *Id*. at 39. However, she explained that, despite the length of time the CUA has been involved with the family, "We don't know the exact type of disability. We were never provided documentation." *Id*.

Father testified on direct examination that he suffers from muscular dystrophy, which is a progressive disease. *Id*. at 159-160. He testified that he needs a nurse aide, and that she was present in the courtroom during the subject proceeding. *Id*. at 161. Father testified that, as of June of an unspecified year, "I stopped walking." *Id*. at 162.

During direct examination, Father testified, "my uncle's wife came from Chicago. She's here with me today." *Id*. at 171. He acknowledged that his uncle's wife is a special education teacher. *Id.* Father testified, "She's here to offer to adopt the children, and she's offered that[,] and she's here to help me if I have the children, to help me raise them and teach me the ways." *Id*. at 172.

At the conclusion of the testimonial evidence, the trial court found Father not credible. *Id*. at 189. The court placed its findings of fact and conclusions of law on the record in open court and stated to Father, "I waited four years for you to put yourself in a position to care for these children, and you have not done that. You are just simply not able to care for the children." *Id*. at 190. The court found relevant that Father never provided documents to support his testimony over the years. The court stated, in part, "You say you have these mental therapy courses. Where are the documents to support all of these issues? Where are the documents to support your physical condition? Where's your medical records?" *Id*. at 191.

After careful review, we conclude that the evidence amply demonstrates that Father's repeated and continued incapacity to provide for the special needs of O.C.-A., I.C.-A., and Y.E.C.-A., and to acknowledge his responsibility in their placement, have caused O.C.-A., I.C.-A., and Y.E.C.-A. to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. Further, Father's incapacity cannot or will not be remedied.

Further, we are unpersuaded by Father's fourth and fifth questions on appeal, *i.e.*, whether the trial court abused its discretion by denying his alleged requests to expand his visitation time with O.C.-A., I.C.-A., and Y.E.C.-A. "over the course of several years," and by denying his requests for an updated parenting capacity evaluation. As set forth above, Ms. Hall testified that Father's visits never became unsupervised because he did not achieve his permanency plan goals, despite moderate compliance. N.T., 12/7/21, at 20.

In addition, on cross-examination by Father's counsel, Ms. Hall testified that Father's request for another parenting capacity evaluation was denied because "all recommendations were not completed." *Id*. at 51. Ms. Hall's testimony is corroborated by Dr. Duggal's recommendation that another evaluation be conducted following Father's completion of the recommendations that he outlined. Parenting Capacity Evaluation, 10/11/19, at 15. Ms. Hall's testimony that Father did not complete the recommendations are supported, at minimum, by her testimony that he failed to provide medical documentation about his condition, which Dr. Duggal recognized was relevant

to his capacity to parent, and he failed to complete the domestic violence program. Father's fourth and fifth issues fail.

In his sixth issue, Father questions whether the trial court abused its discretion by limiting testimony by him and his family members for the purpose of changing the court's "preconceived notion" that he is "physically unable to care for himself or his children." Father's brief at 5. As best we can discern, Father discusses this question at nearly the end of his brief. Specifically, Father asserts that the court erroneously prohibited his counsel "to ask [him] questions tending to show the physical impossibility of [F]ather physically abusing his wife." Father's brief at 82. He also asserts that the court erroneously precluded the testimony of the paternal grandfather and Father's brother proffered "to provide their observations regarding [F]ather's physical condition." Father's brief at 82. For the following reasons, we conclude that the issue fails.

> This Court has stated:
>
> When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.
>
> An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Phillips v. Lock*, 86 A.3d 906, 920 (Pa.Super. 2014) (quoting *Stumpf v. Nye*, 950 A.2d 1032, 1035-36 (Pa.Super. 2008)).

With respect to the trial court's preclusion of Father's testimony on direct examination "tending to show the physical impossibility of [F]ather physically abusing his wife," the court found that counsel was attempting to relitigate Father's defense of Mother's domestic abuse allegations. Father's brief at 82 (citing N.T., 12/7/21, at 169-170). As the record support's the trial court's characterization, we discern no abuse of discretion.

With respect to the trial court's preclusion of any testimony by the paternal grandfather, Father's counsel requested on the record in open court to present him as a witness to "shed a little more light on [F]ather's physical abilities and disabilities, and also his impressions of his cognitive abilities as well." N.T., 12/7/21, at 182. The trial court denied the request stating, in part, "It would not advance the issue." *Id*. Father's counsel then requested to present the testimony of Father's brother for the purpose of his observations of Father's "parenting" and "Father conducting himself, doing different things for himself." *Id*. at 182-183. The trial court denied the request finding, in essence, that it would be cumulative to the observations of Ms. Hall, who had observed Father over the course of the case. *Id*. at 183-184. To the extent that Father proffered the testimony of paternal grandfather and Father's brother as rebuttal witnesses, it would have been relevant. Nevertheless, we conclude that the trial court's preclusion of the testimony

was not harmful or prejudicial because the court terminated Father's parental rights notwithstanding his physical condition. Therefore, we conclude that the court did not commit reversible error.

It follows that, to the extent that Father claims in his sixth question that the decrees are the result of bias due to his physical disability, he has failed to make his case before this Court. Even if the trial court considered Father's physical disability, it is well-settled that Section 2511(a)(2) provides the statutory basis for "terminating involuntarily the rights of a parent with a physical or mental impairment." *In re Adoption of J.J.*, 515 A.2d 883, 893 (Pa. 1986). Our Supreme Court emphasized, "the focus in such cases is the effect which an impairment has on the person's ability to provide parental care, not the mere fact of impairment. . . ." *Id*. As such, the Court stated, "The fact that a parent suffers from a physical or mental disability is not, and never was, the only relevant factor in determining whether his or her parental rights should be terminated, or whether there should be a different legal standard applied." *Id*.

As detailed above, ample evidence exists in this case to support the termination of Father's parental rights pursuant to § 2511(a)(2), notwithstanding his physical disability. Accordingly, the trial court did not abuse its discretion in terminating Father's parental rights pursuant to § 2511(a)(2).

Next, we review whether the trial court gave "primary consideration to the developmental, physical and emotional needs and welfare of" O.C.-A., I.C.-A., and Y.E.C.-A. in terminating Father's parental rights as mandated by 23 Pa.C.S. § 2511(b). The trial court was required to "discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *In re C.M.S.*, *supra* at 1287. With respect to the affection children have for parents, this Court has recognized:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa.Super. 2008) (internal citations and quotation marks omitted).

In addition, our Supreme Court has explained, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, *supra* at 268. The Court directed that, in weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. The *T.S.M.* Court observed,

- 27 -

"[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

On appeal, Father asserts that he has maintained a strong bond with O.C.-A., I.C.-A., and Y.E.C.-A., ages nine, seven, and three at the time of the proceeding, and "the effects of severing the strong bond . . . would have a more harmful than beneficial effect on the children." Father's brief at 81. This argument implicates Father's seventh and final question presented, whether the court abused erred in failing to consider the children's preference to be reunited with him.

The trial court made the following findings from the bench:

[T]here [will] be some separat[ion] issues[.] I believe that the foster parents will be able to remedy those issues, and I believe that the[y] are in the correct placement to care for these children until they become adults. And that's the test that I must satisfy; whether or not [Father and Mother] can care for these children until they reach adulthood, and that's why I'm finding that there [will] be some harm, but it will not be irreparable, and it will be remedied.

N.T., 12/7/21, at 192. The certified record supports the court's findings.

There is no dispute that Father consistently attended supervised visitations throughout the underlying matter. Ms. Coles, who began supervising the visits in May of 2021, acknowledged on cross-examination by Father's counsel that the children enjoy their interactions with Father. N.T., 12/7/21, at 133. She testified:

[Q]: Do the children have any issues separating at the end of the visits?

[A]: Not — well, they hug their dad, they say they love him, and they, you know — no, not really.

*Id*. at 126.

E.B. became the foster mother of O.C.-A. and I.C.-A. in October of 2019, when they were seven and five years old, respectively. She desires to adopt them. N.T., 12/7/21, at 106.

Ms. Hall, who visited O.C.-A. and I.C.-A. in the foster home monthly throughout her time on this case, testified that O.C.-A. "was well bonded" to E.B. *Id*. at 33. She testified, "He was always happy, never gave any negative information about [E.B.] . . ., and he always seemed to want to be there, based off of his statements that he would make to me." *Id*. Ms. Hall testified that she discussed with O.C.-A. his wishes regarding his permanency goal, and he indicated "that he would like to go home with [F]ather, but as long as he cannot go home with [F]ather, he would love to stay in the home of [E.B.]." *Id*. at 33-34.

With respect to I.C.-A., Ms. Hall testified, "He has definitely opened up more. He's exploring more, but he's very quiet. He enjoys [E.B.]'s help and her assistance. He has no issues in the home. . . ." *Id*. at 34. Ms. Hall testified that I.C.-A. looks to E.B. to provide his daily needs. *Id*. at 35.

E.B. also testified regarding O.C.-A.'s and I.C.-A.'s educational delays, her persistence in having them tested for IEP's, and her assistance with their schoolwork. *Id*. at 106-107, 118-119. She explained:

> [S]eeing how they've been with me over a year, it's [sic] taken that long for them to comprehend three letter words. And, in [I.C.-A.'s] case, because he also has memory loss from his condition — so, he does not retain information the same way another kid would.[9]
>
> So, it's a lot of reintroducing the same work over and over for him. But he is able to grasp some understanding and meaning of words. [O.C.-A.], on the other hand, is excelling because he just needed to learn how to focus.
>
> So, along with the ADHD — attention deficit disorder that they both have, you have to give them the information in a way where they retain it.

*Id*. at 118-119. She stated that O.C.-A.'s and I.C.-A.'s "current report cards . . . shows that they are improving." *Id*. at 108. E.B. also testified that O.C.-A. and I.C.-A. are in therapy, which commenced before they began living with her, for behavioral issues and trauma. *Id*. at 106.

In addition, E.B. testified regarding I.C.-A.'s cardiac problem and his recent appointment at St. Christopher's Hospital, where she took him for an echocardiogram test and lab work. *Id*. at 109. She explained that I.C.-A. had surgery on his heart before she met him, but recent testing showed that I.C.-A.'s "chamber to his left side was supposed to be totally closed off, and only the right side of his heart is supposed to be functioning, but they found

---

[9] E.B. did not clarify what condition of I.C.-A. caused his memory loss.

that it's leaking over." *Id.* E.B. testified that the cardiologist directed that I.C.-A. digest one baby aspirin daily, and that his cardiac problem be monitored. *Id*.

With respect to the youngest child, Y.E.C.-A., he has resided with his foster mother, K.G., since his discharge from the hospital after birth. Ms. Hall testified that she regularly visited Y.E.C.-A.'s foster home as well, and she found, "He's very attached to [K.G.]." *Id*. at 36.

K.G. testified that Y.E.C.-A. began residing with her in September of 2018. *Id*. at 137. She desires to adopt him. *Id*. at 140. K.G. testified that Y.E.C.-A. "has a speech delay" for which he receives therapy. *Id*. at 137, 139.

Based on the foregoing, the certified record demonstrates that the termination of Father's parental rights will serve the developmental, emotional, and physical needs and welfare of O.C.-A., I.C.-A., and Y.E.C.-A. *See In re A.S.*, *supra* at 483 ("[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent."). Therefore, we discern no abuse of discretion by the court in terminating Father's parental rights pursuant to § 2511(b). Father's seventh and final issue fails. Accordingly, we affirm the decrees pursuant to 23 Pa.C.S. § 2511(a)(2) and (b).

Decrees affirmed. Orders affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>7/18/2022</u>